**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| CHRISTOPHER GOSA and DENNIS CHAPMAN, <br><br> Plaintiffs, <br><br> vs. <br><br> NU-WORLD AMARANTH, INC., <br><br> Defendant. | No. 10-CV-2074-LRR <br><br> **ORDER** |

_____

## TABLE OF CONTENTS

*I.   INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *1*

*II.  PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*III. SUBJECT MATTER JURISDICTION* . . . . . . . . . . . . . . . . . . . . . . . . *2*

*IV.  SUMMARY JUDGMENT STANDARD* . . . . . . . . . . . . . . . . . . . . . . . *2*

*V.   RELEVANT FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . *3*
    *A.   Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*
    *B.   Chapman* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*
    *C.   Gosa* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *5*

*VI.  ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*
    *A.   Legal Standards* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*
    *B.   Chapman Motion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *8*
    *C.   Gosa Motion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *10*

*VII. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *14*

## *I. INTRODUCTION*

The matters before the court are Defendant Nu-World Amaranth, Inc.'s ("Nu-World") "Motion for Summary Judgment Regarding Plaintiff Dennis Chapman's Claims" ("Chapman Motion") (docket no. 12) and "Motion for Summary Judgment Regarding Plaintiff Christopher Gosa's Claims" ("Gosa Motion") (docket no. 14) (occasionally

referred to collectively as "the Motions").

## II. PROCEDURAL HISTORY

On or about November 17, 2010, Plaintiffs Christopher Gosa, Dennis Chapman, and Gary Dittrick filed a Petition at Law ("Complaint") (docket no. 3) in the Iowa District Court for Delaware County, No. LACV007065, against Nu-World. On December 15, 2010, Nu-World removed the action to this court on the basis of diversity jurisdiction. On December 20, 2010, Nu-World filed an Answer (docket no. 5), denying Plaintiffs' allegations and asserting affirmative defenses. On January 11, 2011, the parties stipulated to Gary Dittrick's dismissal from the lawsuit. *See* Stipulation of Voluntary Dismissal (docket no. 7) at 1.

On November 17, 2011, Nu-World filed the Motions. On December 27, 2011, Chapman filed a Resistance (docket no. 18) to the Chapman Motion, and Gosa filed a Resistance (docket no. 19) to the Gosa Motion. On January 4, 2012, Nu-World filed a Reply (docket no. 23) with respect to the Gosa Motion and a Reply (docket no. 24) with respect to the Chapman Motion. The matters are now fully submitted and ready for decision.

## III. SUBJECT MATTER JURISDICTION

The court has diversity jurisdiction over this case because complete diversity exists between the parties and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332 ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is . . . between citizens of different States . . . ."). Chapman and Gosa are citizens of Iowa. Nu-World is an Illinois corporation with its principal place of business in Illinois. The court is satisfied that subject matter jurisdiction exists.

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)) *cert. denied*, No. 11-609, 2012 WL 171151 (Jan. 23, 2012). "[S]elf-serving allegations and denials are insufficient to create a genuine issue of material fact." *Anuforo v. Comm'r*, 614 F.3d 799, 807 (8th Cir. 2010). "To survive a motion for summary judgment, the nonmoving party must substantiate [its] allegations with sufficient probative evidence [that] would permit a finding in [its] favor based on more than mere speculation, conjecture, or fantasy." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011) (second alteration in original) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 733-34 (8th Cir. 2003)) (internal quotation marks omitted). The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *See Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 819 (8th Cir. 2011).

## V. RELEVANT FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to Plaintiffs and affording them all reasonable inferences, the uncontested material facts are as follows.

### A. Parties

Chapman was an employee at Nu-World until his termination on June 29, 2010. Gosa was an employee at Nu-World until his termination on February 5, 2010. Nu-World produces flour from many different types of grain, including amaranth, a small grain used to replace wheat in gluten-free products. Nu-World sells flour to health food manufacturers, many of whom demand confidentiality regarding the recipes and processes involved in production.

## B. *Chapman*

Chapman began working at Nu-World in 2007. Defendant's Appendix in Support of Motion for Summary Judgment Regarding Plaintiff Dennis Chapman's Claims ("Nu-World Chapman App'x") (docket nos. 12-3 through 12-13) at 2. As part of his employment, Chapman signed a Confidentiality Agreement and two versions of the Nu-World Good Manufacturing Practices. *Id.* at 10-21. Both versions of the Good Manufacturing Processes stated, "Cameras and photographs are strictly prohibited in all areas unless OKed or requested by the plant management . . . . This includes picture taking by newspaper or media photographers as well as plant personnel." *Id.* at 15, 19.

As a Nu-World employee, Chapman's job duties included reporting grain contamination. *See id.* at 3. The presence of rodent feces or other extraneous matter is a common problem with grain production. *See id.* at 4. Nu-World management encouraged employees to report contamination, and employees who reported contamination in the past did not experience adverse consequences. *See id.* Chapman raised concerns with Nu-World management, including Dittrick, who had been Chapman's supervisor for part of his employment, about rodent feces present in some of Nu-World's grain. Chapman's Appendix in Support of Resistance to Defendant's Motion for Summary Judgment (docket nos. 18-3 through 18-4) at 1, 9. Dittrick informed Chapman that he previously contacted the Iowa Department of Agriculture to report contaminants in Nu-World's food products. *See id.* at 9. After Nu-World terminated Dittrick's employment in December of 2008, he called KGAN, a local news station, to report the alleged contamination. *See id.* Because he was no longer an employee at Nu-World, Dittrick put KGAN in contact with Chapman. *See id.*

In February of 2010,[1] Chapman "allowed [a] KGAN news crew into Nu-World to

---

[1] A blurry screenshot of the KGAN television report shows the date February 19, 2010. *See* Defendant's Appendix in Support of Motion for Summary Judgment Regarding

4

document contamination in grain." Plaintiff Chapman's Statement of Undisputed Facts (docket no. 18-2) at 1; *see also* Defendant's Statement of Undisputed Facts (docket no. 12-2) at 2. Nu-World was not aware that KGAN had been filming on its property until the report aired in June of 2010. *See* Defendant's Reply to Christopher Gosa's Resistance (docket no. 23) at 3-4. When Nu-World management asked Chapman about the camera crew being on the property, Chapman lied and said that he thought the camera crew was taking pictures of the building for sale. *See* Nu-World Chapman App'x at 6. Nu-World terminated Chapman's employment on June 29, 2010, for "violat[ing] the confidentiality agreement [Chapman] signed with [Nu-World] by letting unauthorized personnel on site. *Id.* at 24. After KGAN's story aired, Iowa inspectors found no contamination in Nu-World's products. *Id.* at 7.

### *C. Gosa*

Gosa also began working at Nu-World in 2007. *See* Defendant's Appendix in Support of Motion for Summary Judgment Regarding Plaintiff Christopher Gosa's Claims ("Nu-World Gosa App'x") (docket nos. 14-2 through 14-29) at 7. Gosa had considerable work performance issues throughout his employment with Nu-World, including arriving late to work on multiple occasions, failing to show up for work or call to inform Nu-World he would not be at work on multiple occasions, sleeping at work, extending his breaks and missing work to serve jail time. *See id.* at 14-36.

As a Nu-World employee, Gosa's job duties included reporting grain contamination. *See id.* at 9. Nu-World encouraged its employees to report contaminants, and past employees who had reported contamination did not suffer adverse consequences. *See id.* at 10, 20. On October 15, 2009, Gosa observed rodent droppings in some of the grain he was assigned to grind. *See id.* at 10, 16-18. Gosa alerted his supervisor to the droppings.

---

Plaintiff Christopher Gosa's Claims ("Nu-World Gosa App'x") (docket nos. 14-2 through 14-29) at 77.

*See id.* Nu-World quality assurance tested the grain and found that the amount of contamination was within United States Food and Drug Administration ("FDA") limits. *See id.* at 16. When Gosa's supervisor informed him that the grain was within FDA limits and told him to grind the grain, Gosa refused. *See id.* at 17. After being told several times to grind the grain, Gosa became angry and called his supervisor a "dumb-ass."[2] *Id.* at 18. The next day, Nu-World suspended Gosa for "[i]nsubordination and aggressive behavior." *Id.* at 47.

After the rodent droppings incident, Gosa continued to have attendance problems at Nu-World. *See id.* at 21-25. On January 14, 2010, Nu-World suspended Gosa from work for three days for "[e]xcessive absenteeism & tardiness" and gave him an explicit warning that "[a]ny unexcused absence, tardiness or leaving early will result in termination." *Id.* at 52. After receiving this warning and taking two approved weeks off work to serve jail time, Gosa was late for work three times between February 1, 2010, and February 5, 2010. *See id.* at 57. On February 5, 2010, Nu-World terminated Gosa's employment for his "poor attendance record and tardiness." *Id.*

## VI. ANALYSIS

In the Motions, Nu-World maintains that it terminated Chapman and Gosa for conduct that is not protected by any clear public policy. Chapman and Gosa argue that they were fired for reporting grain contamination, and, therefore, their terminations violated public policy.

### A. Legal Standards[3]

An employer may typically terminate an at-will employee at any time. *Ballalatak*

---

[2] Nu-World's documentation states that Gosa called Nu-World "dumb asses," Nu-World Gosa App'x at 48, while Gosa claims that he was calling only his supervisor a "dumb-ass," *id.* at 18.

[3] The parties do not dispute that Iowa law applies to this action.

*v. All Iowa Agric. Ass'n*, 781 N.W.2d 272, 275 (Iowa 2010). However, an employee may claim wrongful discharge when the reason for termination is contrary to public policy if the employee can show:

> (1) existence of a clearly defined public policy that protects employee activity; (2) the public policy would be jeopardized by the discharge from employment; (3) the employee engaged in the protected activity, and this conduct was the reason for the employee's discharge; and (4) there was no overriding business justification for the termination.

*Id.* (quoting *Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 761 (Iowa 2009)).[4]

"It is generally recognized that the existence of a public policy, as well as the issue whether that policy is undermined by a discharge from employment, presents questions of law for the court to resolve." *Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 282 (Iowa 2000). The public policy at issue in a wrongful discharge claim must be "'a well-recognized and defined public policy of the state.'" *Ballalatak*, 781 N.W.2d at 275 (quoting *Springer v. Weeks & Leo Co.*, 429 N.W.2d 558, 560 (Iowa 1988)); *see also Davis v. Horton*, 661 N.W.2d 533, 536 (Iowa 2003) ("[I]owa courts proceed cautiously and will only extend . . . recognition to those policies that are well recognized and clearly defined."). "[T]he discretion employers have to discharge at-will employees without cause will be limited only under narrow circumstances, and the law will continue to give law-abiding employers the freedom to make managerial decisions in the operation of their businesses." *Jasper*, 764 N.W.2d at 763. To determine whether a discharge jeopardizes

---

[4] Some Iowa courts previously articulated the elements of a wrongful termination in violation of public policy claim as: "(1) engagement in a protected activity; (2) discharge; and (3) a causal connection between the conduct and the discharge." *Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 281 (Iowa 2000); *see also Teachout v. Forest City Cmty. Sch. Dist.*, 584 N.W.2d 296, 299 (Iowa 1998). The Iowa Supreme Court stated, "[The] four part structure of proof . . . parallels the approach [the Iowa Supreme Court has] followed in addressing the tort on a case-by-case method." *Fitzgerald*, 613 N.W.2d at 282 n. 2.

public policy, the employee must show "the conduct engaged in not only furthered the public policy, but dismissal would have a chilling effect on the public policy by discouraging the conduct." *Fitzgerald*, 613 N.W.2d at 284.

To satisfy the high causation standard for a wrongful discharge action, "[t]he employee's engagement in protected conduct must be the determinative factor in the employer's decision to take adverse action against the employee." *Teachout v. Forest City Cmty. Sch. Dist.*, 584 N.W.2d 296, 301 (Iowa 1998) (emphasis omitted). "A factor is determinative if it is the reason that 'tips the scales decisively one way or the other,' even if it is not the predominant reason behind the employer's decision." *Id.* at 302 (quoting *Smith v. Smithway Motor Xpress, Inc.*, 464 N.W.2d 682, 686 (Iowa 1990)). The employee must also "offer adequate evidence from which a lack of justification for termination can be inferred" to satisfy the final element of a wrongful termination action. *Fitzgerald*, 613 N.W.2d at 282.

### B. Chapman Motion

Nu-World maintains in the Chapman Motion that it terminated Chapman's employment because he violated the Confidentiality Agreement and Good Manufacturing Practices documents that he signed by allowing a KGAN news crew onto Nu-World's private property without its permission. Chapman argues in his Resistance that Nu-World terminated his employment because he alerted the media to a public health risk and that public policy protects internal whistleblowers and employees who refuse to violate regulations.

Turning to the elements of a wrongful termination claim, the court first concludes that there is no clearly defined public policy applicable to the instant action. Chapman asserts two public policies in his Resistance: (1) "public policy protects employees who refuse to violate statutory or administrative regulations" and (2) public policy protects "internal whistle-blowing in certain circumstances." Chapman's Brief in Support of

Resistance (docket no. 18-1) at 6-7. Neither proposed public policy applies to the facts of this action. Chapman did not refuse to violate any statutory or administrative regulation, and he went beyond informing his supervisors about grain contamination. Chapman, instead, violated signed agreements by allowing a news crew onto Nu-World's private property. Chapman does not cite any public policy that protects an employee who violates employment agreements by reporting confidential employer information to the media, and the court declines to extend either of the policies Chapman cites to the facts of this case.

Even if either of Chapman's proffered public policies applies to the instant action, Chapman has not shown that Nu-World terminated his employment because he reported rodent droppings in Nu-World's grain. Nu-World stated on Chapman's termination papers that the reason for his termination was violation of the Confidentiality Agreement by allowing unauthorized personnel on site, and Chapman admitted during his deposition that the reason Nu-World terminated his employment was because he violated his Confidentiality Agreement with the company.

> Q. Do you have any evidence to show that the reason you were given for your termination is not true?
> A. No.
> Q. As far as you know, is the reason that you were given for your termination the accurate reason for your termination?
> A. Yes.

Nu-World Chapman App'x at 8. Chapman also admitted that lying to Nu-World would have been cause enough for Nu-World to fire him. *See id.* at 6. Because Chapman failed to provide evidence beyond speculation or conjecture that Nu-World fired him for reporting grain contaminants, no reasonable jury could find that Nu-World fired Chapman for a purpose contrary to public policy. Thus, there is no genuine issue of material fact regarding causation.

Finally, Nu-World had an overriding business justification for terminating

Chapman's employment. Nu-World has an interest in protecting the confidentiality of both its business practices and the confidentiality of its customers. Shortly after the KGAN story aired, one of Nu-World's customers demanded that Chapman be prevented from working on any of its products. *See* Nu-World Chapman App'x at 22. Additionally, Nu-World has an interest in keeping unauthorized individuals off of its private property. Chapman does not offer any evidence that his firing was not justified. Instead, he argues that public policy overrides any business justification Nu-World had for firing him, which is without merit. Thus, the court finds that Chapman has not made a sufficient showing that Nu-World did not have a business justification for terminating his employment.

In light of the above discussion, the court finds that there is no genuine issue of material fact that Nu-World's reason for terminating Chapman's employment was his violation of the Confidentiality Agreement. The court finds that, as a matter of law, Chapman's actions were not protected by any public policy. Furthermore, even if there was an applicable public policy, Chapman has not established that Nu-World terminated Chapman's employment for protected conduct, and valid business considerations justified Nu-World's actions. Therefore, the court shall grant the Chapman Motion.

### C. *Gosa Motion*

Nu-World maintains that it terminated Gosa's employment due to Gosa's "excessive tardiness & absenteeism." Nu-World Gosa App'x at 58. Gosa maintains that Nu-World terminated his employment in violation of public policy because he alerted his supervisors to rodent droppings in grain and refused to grind grain containing contaminants.

First, there is no clear public policy applicable to this case. Gosa asserts the same two public policies in his Resistance that Chapman asserted: (1) "public policy protects employees who refuse to violate statutory or administrative regulations" and (2) public policy protects "internal whistle-blowing in certain circumstances." Gosa's Brief in Support of Resistance ("Gosa Resistance Brief") (docket no. 19-1) at 7. The facts in this

case do not support Gosa's first public policy argument that he should be protected for refusing to violate statutory or administrative regulations. Gosa refused to grind the grain even after his managers informed him that the grain contaminants were within FDA limits, and Gosa admitted during his deposition that he did not know the FDA requirements for grain contaminants. *See* Nu-World Gosa App'x at 11, 17. Also, there is no record of Nu-World ever failing an inspection, including the inspection that occurred after the KGAN report. Therefore, Gosa cannot claim protection for refusing to violate regulations because there is no evidence that grinding the grain would have violated any regulations. *See Mahony v. Universal Pediatric Servs., Inc.*, 643 F.3d 1103, 1107 (8th Cir. 2011) (noting that "Iowa law protects employees who refuse to participate in unlawful activity, even if the unlawful activity did not in fact occur" but finding that an employee's conduct was not protected because the employee "was not asked to participate in unlawful activity, and [the employee's] speculation that [the employer] was planning to break the law is contrary to undisputed fact"); *cf. Jasper*, 764 N.W.2d at 768 (noting that, along with the timing of a day care employee's firing, "evidence that the center violated the staffing level shortly after [the employee] was discharged . . . circumstantially shows [that the employer] wanted [the employee] to violate the state requirements").

Additionally, the case Gosa cites to support his second proffered public policy protecting internal whistle-blowing, *Kohrt v. MidAmerican Energy Co.*, 364 F.3d 894 (8th Cir. 2004), does not apply to the facts of this action. In *Kohrt*, the employee claimed that he was fired for complaining about company policies that posed a danger to workers. *Id.* at 897. The Eighth Circuit Court of Appeals determined that the Iowa Supreme Court would likely recognize a public policy "against discharging an employee for complaining about safety issues" in light of the Iowa Occupational Health and Safety Act ("IOHSA"). *Kohrt*, 364 F.3d at 900 (citing Iowa Code § 88.1). Gosa, however, did not complain about an occupational danger to Nu-World employees. Therefore, the narrow public policy

created by IOHSA does not apply here. Furthermore, Gosa admitted during his deposition that Nu-World encouraged employees to report contamination, and that employees who reported contamination in the past did not suffer any adverse consequences. *See* Nu-World Gosa App'x at 9-10. "In cases in which the Iowa Supreme Court has found a public policy exception to the at-will employment doctrine, the employee was engaged in some affirmative act above and beyond his employment duties." *Haynes v. Karl Chevrolet, Inc.*, No. 08-0386, 759 N.W.2d 813 (Table), 2008 WL 4725427, at *3 (Iowa Ct. App. Oct. 29, 2008). Thus, Gosa's argument that reporting grain contamination, which is part of his routine job duties, was conduct protected by a clearly defined public policy is without merit.

Second, even if a public policy applied to this case, Gosa has not demonstrated that Nu-World terminated his employment because he informed his supervisors of grain contamination. In his deposition, Gosa admitted that he had many disciplinary problems both before and after he reported the rodent droppings to his supervisors and that Nu-World gave him many chances to fix his disciplinary issues even after he reported the grain contamination. *See* Nu-World Gosa App'x at 12-25. Gosa admitted to his disciplinary problems in his deposition and admitted that Nu-World could have fired him earlier than it did for his poor attendance and disciplinary issues. *Id.*

Gosa also argues that the timing of his firing coincided with the timing of KGAN's visit to the site, and, therefore, the KGAN visit was a factor in Nu-World's decision to terminate his employment. As Nu-World points out, it fired Gosa on February 5, 2010, fourteen days before KGAN visited Nu-World. Gosa failed to present any evidence that either he or Nu-World knew about KGAN's visit until June of 2010, let alone that the KGAN visit was a factor in the decision to terminate Gosa. *Cf. Beekman v. Nestle Purina Petcare Co.*, 635 F. Supp. 2d 893, 922 (N.D. Iowa 2009) ("Temporal proximity may be a factor weighing in favor of finding causation, but in the absence of other evidence,

temporal proximity is insufficient to establish a prima facie case of retaliatory discharge.'" (quoting *Bumgarner v. Grafco Indus., LP*, 581 F. Supp. 2d 1052, 1063 (S.D. Iowa 2008) (internal marks omitted))). Additionally, Nu-World fired Gosa more than three months after Gosa informed his supervisors about the grain contamination, and he continued to have performance problems both before and after the rodent droppings incident. Gosa failed to provide any evidence beyond speculation and conjecture that Nu-World fired him for reporting grain contamination, and there is ample evidence of his many work performance issues. Thus, there is no genuine issue of material fact that the reason Nu-World fired Gosa was due to his performance issues because, on this record, no reasonable jury could find that Nu-World fired Gosa for reporting grain contamination.

Third, Gosa has not demonstrated how his termination undermined any public policy. The only argument Gosa makes regarding this prong is that "when employees are discharged for doing exactly what the public policy encourages, it undermines the public policy." Gosa Resistance Brief at 9. Gosa has failed to show that Nu-World terminated his employment because he informed Nu-World about grain contamination, and, thus, he has not shown that Gosa's firing undermined a public policy. Finally, due to Gosa's history of disciplinary problems throughout his employment, Nu-World had sufficient justification to terminate Gosa's employment. Gosa argues that public policy overrides Nu-World's business justification for firing him. This argument lacks merit. Accordingly, Gosa failed to provide sufficient evidence that Nu-World was not justified in terminating his employment.

In light of the foregoing discussion, the court finds that no public policy is at issue here. Even if a public policy does apply, there is no genuine issue of material fact regarding Nu-World's reason for firing Gosa—his attendance problems. Additionally, Gosa's attendance problems also provided Nu-World with sufficient justification for terminating his employment. Thus, the court shall grant the Gosa Motion.

## VII. CONCLUSION

For the foregoing reasons, Nu-World's "Motion for Summary Judgment Regarding Plaintiff Dennis Chapman's Claims" (docket no. 12) and "Motion for Summary Judgment Regarding Plaintiff Christopher Gosa's Claims" (docket no. 14) are **GRANTED**. The clerk's office is **DIRECTED** to enter judgment in favor of Defendant Nu-World Amaranth, Inc. and against Plaintiffs Dennis Chapman and Christopher Gosa. It is also **DIRECTED** to **CLOSE THIS CASE**.

**IT IS SO ORDERED.**

**DATED** this 10th day of February, 2012.

_____
LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA